BENJAMIN v. HUNTER, Warden.

No. 1038.

District Court, D. Kansas, First Division.

Dec. 29, 1947.

W. H. Biddle, of Leavenworth, Kan. (Howard F. McCue, of Topeka, on the brief), for petitioner.

James W. Wallace and Eugene W. Davis, Asst. U. S. Attys., both of Topeka, Kan., and Lt. Colonel L. A. Arn, J.A.G.D., of Washington, D. C., for respondent.

MELLOTT, District Judge.

Petitioner, by a petition for a writ of habeas corpus, assails the validity of his detention in the United States Penitentiary at Leavenworth, Kansas. Therein he alleges that he is serving an eight-year sentence, as remitted, imposed by a general court-martial of the army on June 27, 1943, at Turlock, California, pursuant to general order No. 1039, 9th Service Command, Fort Douglas, Utah, having been charged with, and convicted of, assault with intent to kill, escape, desertion and attempt to escape, being violation of the 93rd, 69th, 58th and 96th Articles of War respectively, 10 U.S.C.A. §§ 1565, 1541, 1530, 1568.

The petition alleges eleven defects in the proceedings before the court-martial which, it is contended, deprived the court-martial of jurisdiction and resulted in petitioner being denied due process of law. Summarizing the allegations they are: (1) that he was intimidated at the court-martial, which prevented him from disclosing pertinent facts in his defense; (2) that he was prevented from preparing his defense by being refused the privilege of referring to law books, particularly the Manual for Courts-Martial; (3) that he was permitted to proceed in the case, up to and past plea, before being informed that among the charges against him was one punishable by death; (4) by notifying him that his crime, if he should be convicted, was punishable by death and by trying, convicting and sentencing him all on the same day; (5) by permitting him to proceed in a capital case with insufficient counsel; (6) by permitting him to proceed to trial with no more preparation than two short visits, aggregating approximately thirty minutes, with his counsel; (7) by bringing him to trial without a full and complete investigation into the facts of the case as required by the Articles of War; (8) by trying him for committing an offense—assault with intent to kill—which had never been committed inasmuch as the acts—exchange of shots on a station platform at the time he made his escape—had been performed with the knowledge, assistance and consent of the alleged victim and were not designed to harm him; (9) by charging and convicting him of the crime of desertion for which crime he had previously been convicted but never restored to duty, "thus subjecting him twice to punishment for the same crime"; (10) because of the prejudice by the court evidenced by its open sanction of concealment of "vital factors" which would have proved that petitioner was not and could not have been guilty of one or more of the charges against him and (11) because of failure of the reviewing authority "to inquire into the truth of and reason for obvious avoidance and concealment of vital evidence in the case."

■ At the hearing petitioner's request for leave to amend his petition to insert another charge of irregularity in the court-martial proceeding was granted; but, since no actual amendment of the petition was made, the court, for present purposes, considers the language used by the petitioner in his request to be an actual amendment

charging "that the body of men that acted as a court-martial were not competently composed and the court-martial lacked the necessary number of officers in that instead of having both a president and a law member of the court as required by law one man attempted to act in the same capacity. Therefore the court-martial was either lacking a president or a law member."

The response, supplemented by a complete photostatic copy of the record of trial by the court-martial, brought onto the record the facts briefly alluded to by petitioner in his petition which, summarized, show that he has been confined in various penal institutions since June 27, 1943 under a fifteen-year sentence imposed by a court-martial upon charges and specifications; (1) of escaping on or about March 22, 1943 from confinement in a stockade before being set at liberty by proper authority; (2) deserting the service of the United States on or about March 22, 1943 and remaining in desertion until apprehended on or about May 23, 1943; (3) attempting, on or about June 11, 1943, to escape from confinement in the custody of Corporal Charles Bell at Sacramento, California; and (4) willfully and feloniously shooting at Corporal Charles Bell with a pistol at Sacramento, California on or about June 11, 1943.

Following a trial before the court-martial petitioner was found guilty of all the specifications and charges, and sentenced to be discharged from the service, to forfeit all pay and allowances due or to become due and to be confined at hard labor at such place as the reviewing authorities should direct for a period of fifteen years. The sentence was adjudged on June 27, 1943 and duly approved. On November 12, 1945, so much of the sentence to confinement as is in excess of eight years was remitted at the direction of the President.

There seems to be no substantial dispute between the parties as to the facts disclosed by the photostatic copy of the record of trial of petitioner by a general court-martial which convened at Rehabilitation Center, Turlock, California, June 27, 1943, and which has been received in evidence in this proceeding. The court therefore finds the facts to be as shown by said record. Ref-

erences thereto will be indicated by "R", followed by the paging indicated on the lower right-hand corner. References to the testimony, unless otherwise indicated,— (e.g. T. 15)—refer to the transcript of the proceedings before this court under date of July 9, 1947.

### Findings of Fact.

Petitioner, a member of the United States Army, prior to March 22, 1943, had been confined in the guard house at Merset Army Air Base, California upon a charge which subsequently has been dismissed. While there he tore up the ventilating system, went out through the boiler rooms and made his escape. T. 44, 45. He was apprehended in Washington, D. C. six weeks later, placed in confinement, and about five months later was tried for, and convicted of, escape and desertion. T. 45.

While in confinement in the stockade at the Rehabilitation Center, Turlock, California, he was observed by a guard climbing over the north fence at about 0220, March 22, 1943. He assured the guard that, after obtaining a couple of beers, he would be back. He did not return. R. 9, 10. T. 15, 46.

Shortly prior to June 1, 1943 petitioner was apprehended in St. Louis, Missouri and confined in the city jail. T. 14, 15. On June 1, 1943 Corporal Charles R. Bell and Private First Class Roy H. Ferrenbach were detailed to travel to St. Louis and return him to the Post. R. 10.

The prisoner and his guards arrived at the Southern Pacific station in Sacramento, California where it was necessary that they change trains in order to proceed to Turlock. They entered the train bound for Turlock and took their seats a few minutes before the train was to leave and, while Ferrenbach was out of sight arranging luggage, the prisoner, who at that time was handcuffed, removed an automatic colt revolver from his clothing, aimed it at Corporal Bell, backed away from him and made his exit from the car. R. 10, 102, 103 and T. 15, 16.

Corporal Bell gave chase and he and the prisoner exchanged shots in the railroad yard, each firing five times. After empty-

ing his gun (except for one bullet) the prisoner raised his hands and surrendered to the corporal. He was returned to the train, brought to Turlock and delivered over to the authorities at the Post. R. 10.

The charge sheet containing the charges and specifications, which have been alluded to in the opening paragraphs of this opinion, was signed by Second Lt. Donald L. Acanlon. R. 15-17. They were investigated by Second Lt. Carling I. Malouf, who recommended trial by general court. R. 21, 22. They were referred for trial to Maj. Benjamin G. Fleischman, Trial Judge Advocate General Court-Martial, appointed by paragraph 41, special orders No. 119, headquarters 9th Service Command by command of Maj. Gen. Joyce per Archie L. Tower, Lt. Col. J. A. G. D. Assistant to Director Administrative Division (R. 17), after the prisoner had been examined by a psychiatrist. R. 58.

The designated president of the court, (i.e. the one first named) Lt. Col. Edward A. Baer, was challenged by the defense peremptorily (R. 63-65), and left the proceedings. The court was rearranged with Norman E. Holden, law member, as president. R. 63-68. The prisoner, being asked if he objected to any other member present, replied in the negative. Being asked if he was satisfied to proceed with the trial, he responded that he was.

Pleas of guilty to some of the charges and pleas of guilty in some instances to lesser charges than those in the charge sheet were interposed by the prisoner together with pleas of not guilty to the charges made. R. 67, 68. The president of the court advised the prisoner that the effect of several of his pleas would be that he would be subject to the maximum penalty; but the prisoner stated he felt he "should enter the pleas of guilty." R. 68.

The prisoner, being asked whether he desired any part of the manual read, requested that the part relative to lesser included offenses be read. After that was done he was asked whether he desired "any further reading from the Manual or any other authority." His counsel asked for the reading of the "paragraphs relative to Reasonable Doubt" and the prosecution read from "pages 31 and 63 M. C. M. 1928." R. 68. The trial then proceeded.

The investigating officer, Second Lt. Carling I. Malouf, during the investigation preceding the trial before the court-martial, had permitted the prisoner to cross-examine Corporal Bell and gave him a copy of the statement which Bell had made. R. 93.

At the trial before the court martial witnesses were called and testified both for the prosecution and in the prisoner's behalf. R. 93-98. He testified at length. R. 98-105. See also summary R. 9-12.

The court-martial found the prisoner guilty of all the specifications and charges, (R. 109) the record of trial was reviewed by the Staff Judge Advocate (R. 9 et seq.) and by a Board of Review. R. 2. Sentence, as previously referred to, was adjudged on June 27, 1943 and approved by Col. P. R. Davison, Chief of Staff. R. 5. Commitment under which petitioner is now being confined was duly issued (R. 4, 5) the sentence being reduced to eight years by the President under November 12, 1945. R. 1.

## Opinion

Petitioner, a bright, personable young man, elected largely to conduct the hearing before this court under his petition, although the court had appointed counsel to do so, who was present for that purpose. Subsequently, another member of the bar of this court, at petitioner's request, was appointed by the court to review the entire record and to collaborate wtih counsel, previously appointed, in the preparation of a brief on the questions of law raised. That has been done and the briefs have been carefully examined.

■ At the outset of the trial the court outlined its powers and duties in a habeas corpus proceeding (T. 10, 11, 12) and advised petitioner that it could not try the issue of his guilt or innocence of the charges tried before the court-martial. Nevertheless petitioner testified at length as to what had occurred just preceding the exchange of shots with Corporal Bell on the station platform in an evident effort to have this court pass upon his present contention that the shooting was all a part of a pre-

viously concocted scheme, between him and Corporal Bell, to make it appear that he had attempted to escape. This evidence, he appears to think, had some competency to prove that the trial before the court-martial was defective because he and Corporal Bell had "suppressed vital testimony relating to the case" (T. 17); that he, himself, had been "intimated" into telling a fictitious story; that Bell had actually given the gun to him; that the gun battle "was a sham, * * * something that was cooked up between" (T. 19) him and Bell to make the escape "look good"; and that if the truth had been brought out it "would have disgraced the entire Turlock organization."

At another stage of the proceeding petitioner made some point of the fact that he had not been permitted to tell, during the trial before the court-martial, where he had secured the gun. In that connection he states: "I had no intention of putting my life in danger by telling (the court-martial) the whole true story, but I started to say 'I got it from'—the record will show 'I got it from,' and at that point an objection was made and sustained." T. 20. "Nobody wanted it brought out. The court knew where I got the gun. Everybody on the post knew * * *." "They were all protecting Bell and didn't want a lousy mess on their hands. * * * by covering these matters up and refusing me leeway to testify without fear of bodily danger, the court denied me due process of law. * * *." T. 20. The charge is, of course, a serious one; and petitioner was permitted to tell his story. No findings based thereon have been made; for this court is far from satisfied as to the truth of the present assertions. Examination of the record of the court-martial discloses that petitioner testified at length in his own behalf. R. 98-106. His rights were fully explained to him and he undertook to tell in his own words exactly "what happened * * * on arrival at Sacramento." His answer fills approximately two, closely written, pages of the record. R. 102, 103. On cross-examination, when he was asked where he got the gun (R. 105) his counsel objected on the ground that was not in the charge or specification and the objection was sustained. R. 106.

This court, therefore, cannot find that he was denied due process of law in the respect urged.

Petitioner related at the hearing he had been able to exercise "such power of persuasion" over Corporal Bell during the two days' train trip from St. Louis that Bell had agreed to accept a mythical and non-existent $6,000.00 from him to permit him to escape. T. 23. According to his story he and Bell were to elude the other guard and make their escape together; but Bell became "panicky" and the joint "escape" did not materialize. T. 26. They then agreed to have the "sham" gun battle, after which they were "to rendezvous at the Ferry Building in San Francisco." R. 28. Here, again, the evidence is far from convincing. Its pertinency, if any, seems to be to convince this court that the court-martial should not have accepted his plea of guilty to the specification of Charge IV, substituting for the words "with intent to commit felony, viz., murder", the words "with intent to do him bodily harm." R. 9. In that connection he said: "I tried to prove that I did not try to hurt Bell so my plea and my testimony were very inconsistent there and the Court, I believe, it is up to your Honor to decide whether they did or not, erred in not calling that to their attention."

This court, as it pointed out in Anthony v. Hunter, D. C., 71 F.Supp. 823, cited and relied upon by petitioner and his counsel, is not a tribunal sitting in an appellate review of the court-martial judgment and has no authority to examine the record of trial and the process of military appellate review to determine whether errors were committed with respect to the admission of evidence, or whether the rulings upon issues arising during the course of the trial were correct, or whether the findings of guilt were sustained by the evidence. Indeed, where, as here, the accused has entered a plea of guilty to the charge against him, the power of this court in a habeas corpus proceeding is extremely limited. Cf. Thornburg v. United States, 10 Cir., 164 F.2d 37. In any event, this court is not persuaded that the evidence referred to, even if believed, would justify it in setting aside the conviction. More-

over, petitioner does not wish to be re-tried. "A retrial," he says, "is the last thing I would want. \* \* \* I am so deeply ashamed of the evidence that would have to come out, and I certainly wouldn't care to be retried \* \* \*." R. 12.

■ But continuing. Petitioner contends he was "twice convicted of the same crime", viz., desertion. Being confined in the guard house upon a charge later dismissed, he tore up the ventilating system "and went into desertion." R. 45. Thereafter he was tried for and convicted of escape and desertion and sentenced to one year imprisonment. T. 45, 46. While serving that sentence he escaped, as shown in the findings, and was apprehended at St. Louis.

Charge II was "Violation of the 58th Article of War." The specification under it was that the prisoner, "did, at Ninth Service Command Rehabilitation Center, Turlock, California, on or about March 22, 1943, desert the service of the United States and did remain absent in desertion until he was apprehended at St. Louis, Missouri, on or about May 23, 1943." R. 15, 16. To the specification of Charge II the accused pleaded: "Guilty except the words 'desert' and 'in desertion', substituting therefor, respectively, the words, 'absent himself without leave from' and 'without leave', of the excepted words, not guilty, of the substituted words, guilty. To Charge II: Not guilty, but guilty of a violation of the 61st Article of War." R. 67.

The prosecution then asked the President of the Court to explain to the accused the meaning of his plea of guilty, the record at this juncture showing:

"Pres: General Prisoner Benjamin, do you fully understand that by your plea of guilty to the specification and charge of the 69th Article of War, that you did escape from confinement at NSC, Turlock, California, that in making such a plea you admit all the elements of the crime as charged and that you are subject to the maximum penalty prescribed for such an offense. Do you understand that?

"Accused: I do.

"Pres: Do you fully understand that by pleading guilty to violation of the 61st Article of War in substitution for the 58th Article of War under Charge II, that you did absent yourself without leave, that you are admitting all the elements of the charge and the specification to that offense and that you are subject to the maximum penalty?

"Accused: Yes Sir." R. 68.

The Staff Judge Advocate took the view that

"The president of the court erroneously advised the accused that under his plea of guilty of a violation of the 61st Article of War the maximum punishment is discretionary (R. 7). This statement is erroneous in that the maximum limit of punishment for violation of the 61st Article of War is within the discretion of the court, short of death (Article of War 43). As the accused did not desire to change his plea after this explanation, his interest was not prejudiced by this misstatement.

"The president also failed to include in his explanation of maximum punishment the necessary element of total forfeitures (R. 7.)." R. 11.

Under "Comment on the Evidence" he said:

"The evidence presented by the prosecution with respect to the specification and charge II clearly establishes absence without leave, and is sufficient to sustain the finding of intent to desert.

"In addition to his extended absence from his post, the long distance from his post at which he was apprehended, his use of civilian clothing, the intent of the accused to desert the service is clearly established by his own testimony. He stated, 'At all times I did eventually intend to return, *the time depending upon the removal of General Prisoner Andrew Aguilar*. I did know, that should Andrew Aguilar be put in the Disciplinary Company, he would remain there three months which was the custom. At the end of three months, I intended to get in touch with someone here and see if he was still here, but I was apprehended before I had a chance to' (R. 45). An intention to return, coupled with a condition, such as removal of a fellow general prisoner is in effect the equivalent of an intention not to return unless the person is removed. Such intent is sufficient to support a conviction

of desertion (Section 416 (9) Dig.Ops. JAG 1912-40).

"It was incumbent upon the prosecution to establish that the dishonorable discharge had not in fact been executed at the time of the commission of the alleged desertion by the accused. The general court martial order under the terms of which the accused was a general prisoner in confinement at the post should have been introduced into evidence. It would establish that the execution of that part of the sentence adjudging dishonorable discharge was suspended until the soldier's release from confinement, thereby rendering the accused amenable to Article of War 58 (Page 107, Dig.Ops. JAG 1919; Page 400, Dig.Ops. JAG 1912).

"There was, however, introduced into evidence an authenticated extract copy of the morning report showing the change of the accused's status from confinement to escape and from escape to absence without leave. From this it may be presumed that the officer making the entry required by regulation has performed his duty in determining the status of the accused before making an administrative charge of absence without leave against him. This is sufficient to establish the status of the accused as rendering him amenable to Article of War 58 (Section 416 (11) Dig.Ops. JAG 1912-40-CM 199224)." R. 12.

This court cannot hold, as a matter of law, that petitioner was twice tried for the same offense; but even if that were so and he should not have been sentenced under Charge II, the punishment adjudged was within the limits of Article of War 69, Title 10 U.S.C.A. § 1541—Charge I—Article of War 96, Title 10 U.S.C.A. § 1568—Charge III and Article of War 93, Title 10 U.S.C.A. § 1565,—Charge IV.

■ The next contention made by petitioner stems from the fact that after he had peremptorily challenged the designated President of the court the law member, being the ranking member of the court, became its presiding officer. Pointing to language in the Manual directing that the law member "be seated on the immediate left of the President"[1] he urges that this pre-supposes the law member may never become President. This overlooks the proviso shown on P. 28 of the Manual that "The senior in rank among the members present is the president and presiding officer of the court", which likewise should be read in conjunction with P. 2, paragraph 4 stating that "all officers in the military service of the United States * * * shall be competent to serve on courts-martial."

■ Petitioner's contention that he was denied counsel was disproved by his own testimony. T. 63, 64, 65. An officer appointed to defend him stepped aside when he requested and the officer requested by him accepted the responsibility of making his defense. The only complaint petitioner now makes is that he was not trained in the law. He knew this when he selected him. The officer seems to have done a commendable job of defending him. However that may be, this court cannot find that he was deprived of counsel at any step of the proceeding before the court martial.

■ Petitioner testified at some length with reference to mistreatment at the hands of guards and prisoners while he was being held in the stockade awaiting trial. T. 73 et seq. If the facts are as related by him the conduct was, to say the least, reprehensible. But this court may not, years after his trial, release him from custody, merely because indignities may have been committed against him while awaiting trial. The evidence is not sufficient to convince this court that any confession was brought about by the mistreatment or that it was used in evidence against him, nor has it been shown that he was compelled thereby to surrender, or be deprived of, his right to a trial before a fair and impartial tribunal. Moreover, petitioner's admitted propensity for fabricating stories militates somewhat against this court accepting, too readily, everything he now says, especially since none of it is substantiated by other evidence. It is also of some significance that while petitioner gave substantially the same sort of testimony before the court-martial as a justification for his second escape (R. 99, 100), he made no mention of

---

[1] P. 42, A Manual for Courts-Martial U. S. Army, 1928, corrected to April 20, 1943.

mistreatment while being held awaiting trial following his third attempt—the one which resulted in his present incarceration.

In the brief filed by counsel appointed to review the record in the instant case it is urged failure of the officer appointing the court to sign, personally, the order for the execution of the sentence is a fatal defect. The commitment, shown in the record at pages 4 and 5, bears the official seal of "Headquarters Ninth Service Command", states that it was entered "By command of Major General Joyce", bears the typewritten signature "P. R. Davison, Colonel, General Staff Corps, Chief of Staff" and the typewritten endorsement "Chas. C. Quigley, Colonel, Adjutant General's Department, Adjutant General." Article of War 46, Title 10 U.S.C.A. § 1517, provides inter alia that: " * * * every record of trial by general court-martial * * * received by a reviewing or confirming authority shall be referred by him, before he acts thereon, to his staff judge advocate or to the Judge Advocate General. No sentence of a court-martial shall be carried into execution until the same shall have been approved by the officer appointing the court or by the officer commanding for the time being."

The instructions in the manual (footnote 1, supra, at p. 77) are that the officer " * ,* * will sign in his own hand the action taken by him on the proceedings * * *." This court is of the opinion that the requirement of approval is mandatory while the requirement of signature "in his own hand" is directory only. That being so, the court is of the opinion the sentence has been duly approved as required by Article of War 46.

The contention of petitioner and his counsel that the type of investigation provided for under Article of War 70, Title 10 U.S.C.A. § 1542, was not accorded, in view of the fact that the investigating officer afterwards became a witness against him and aided in his prosecution, has been given serious consideration. The court is of the opinion, however, and now holds that, for aught shown by the present record, Article of War 70 was fully complied with. Cf. Anthony v. Hunter, supra. The report of the investigating officer (R. 21, 22) states that he investigated the charges "in accordance with the provisions of Article of War 70 and Paragraph 35 a, Manual for Courts-Martial;" that at the outset he had "informed the accused of the nature of the charges alleged against him; of the names of the accuser and witnesses, so far as known * * *; of the fact that the charges were about to be investigated; of his right to cross-examine all available witnesses against him and to present anything he may desire in his own behalf * * *; of his right to have the investigating officer examine available witnesses requested by him; and that it was not necessary for him to make any statement with reference to the charges against him * * *." It shows that Corporal Bell was examined "in the presence of the accused at his request * * * who stated he did not desire to cross-examine * * *" and "the accused examined the attached written statements." The accused, having "said that he did not desire to make a statement", was not required to do so. The only testimony given by the investigating officer at the trial was with reference to what had occurred at the investigation. He stated "the accused requested that he cross-examine Corp. Bell which he was permitted to do and he was given a statement that Corp. Bell had made, and from the statement that Corp. Bell had made, he made his cross-examination." R. 93. This was not denied, either at the trial before the court-martial or at the hearing of the instant case.

All of the contentions made by petitioner and his attorneys have been considered, whether discussed fully herein or not. None has been found to be sufficient to justify his release although, as counsel point out, his fear of another prisoner and the mistreatment he may have received just prior to his third escape, well may warrant some reduction in his present sentence. That is a matter, however, resting in the sound discretion of the War Department; and this court would not have the temerity to suggest what should be done.

For the reasons set out above this court has now concluded that the writ of habeas corpus heretofore issued must be discharged, petitioner must be remanded to the

custody of the respondent and the petition for a writ of habeas corpus must be dismissed. Order to that effect is this date being signed.